1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ROBERT "BOSTON" WOODARD,

11                    Plaintiff,            No.  2:11-cv-1807 LKK JFM (PC)

12        vs.

13   JOHN W. HAVILAND, et al.,

14                    Defendants.           FINDINGS & RECOMMENDATIONS

15   _____/

16            Plaintiff is a state prisoner proceeding through counsel with a civil rights action

17   pursuant to 42 U.S.C. § 1983.  This action is proceeding on plaintiff's complaint, filed July 8,

18   2011, which contains two claims.  First, plaintiff claims that defendants at California State Prison

19   in Solano, California ("CSP-Solano") retaliated against him for writing articles critical of prison

20   officials which were published in online publications.  Second, plaintiff claims that defendants at

21   California Correctional Center in Susanville, California ("CCC-Susanville") improperly denied

22   plaintiff possession of a typewriter and improperly intercepted and rejected incoming mail.

23   These claims are before the court on plaintiff's motion for partial summary judgment and

24   defendants' motion for summary judgment.

25   /////

26

                                              1

FACTS[1]

At all times relevant to this action, plaintiff was an inmate housed first at CSP-Solano and then at CCC-Susanville.  Defendant Haviland was the Warden of CSP-Solano. Defendant Brown was the Associate Warden over units III and IV at CSP-Solano.  Defendant Blackwell was a correctional lieutenant at CSP-Solano.  Defendant Arthur was a correctional captain over unit III at CSP-Solano.  Defendant Rivas was a Correctional Counselor II assigned to Unit IV at CSP-Solano.  Defendant Ferguson was a correctional lieutenant at CSP-Solano. Defendant Bradley was a mailroom sergeant at CSP-Solano.  Defendant Brooks was a Classification Staff Representative ("CSR") employed by the California Department of Corrections and Rehabilitation (CDCR).  Defendant Barnes was the Warden at CCC-Susanville. Finally, defendant Fleshman was employed in the mailroom at CCC.

A.  Facts Arising From CSP-Solano

Plaintiff has been an inmate in the CDCR since 1977.  (CDCR Inmate Locator.) For over two decades, plaintiff has "written about prison life for various prison and outside print and on-line publications", including "the Fresno-based *Community Alliance* newspaper [(CAN)]".  Pl.'s Ex. B in Support of Motion for Partial Summary Judgment[2], Declaration of Robert "Boston" Woodard in Support of Ex Parte Application for TRO, filed April 27, 2012 (Woodard Decl.), at ¶¶ 3, 5. , which has a circulation of 10,000.  A number of plaintiff's articles can be found online at www.indybay.org.  Id. at ¶ 5.  Mike Rhodes, editor of the CAN, regularly publishes plaintiff's articles, which get "more feedback . . . than any other columnist that [CAN has].  Perhaps more comments than all the rest of the articles put together."  Pl.'s Ex. D, Rhodes Sept. 10, 2009 Test. at 6, 8.

---

[1]  All facts are undisputed unless otherwise noted.

[2]  Except as expressly noted, all references to plaintiff's exhibits and to defendants' exhibits are to exhibits filed in support of their respective motions for partial summary judgment and/or summary judgment.

Plaintiff has been incarcerated at CSP-Solano since April 2006.  Woodard Decl. at ¶ 1.  On May 18, 2008, an article written by plaintiff entitled "Appealing the Impossible" was published online at www.indybay.org.  Pl's Ex. E, Woodard Supp. Decl. in Supp. of TRO ("Woodard Supp. Decl.") at ¶ 5.  In this article, plaintiff named six CSP-Solano staff members by their first initials and last names.  Id.

On April 16, 2009, another article written by plaintiff entitled "Rogue Prison Staff: Breaking All The Rules" ("the article") was published online at www.indybay.org. Woodard Decl. at ¶ 12.  In the article, plaintiff identified the following six CSP-Solano staff members – whom he called "rogue prison staff" – by their first initials and last names: M. Vieira, C. Ferguson, R. Ibarra, R. Coker, S. York, and M. Bradley.  A complete copy of the article is attached as Exhibit C to the Woodard Declaration.

On July 9, 2009, defendant Ferguson learned about the article.  Pl.'s Ex. A, Attachment 1 to Declaration of J. Haviland in Opposition to Plaintiff's Motion for Temporary Restraining Order (Haviland Decl.).  After reading the article, defendant Ferguson prepared a General Chrono, which reads as follows:

> On Thursday, July 9, 2009, at approximately 0700 hours, I received information relative to a website article (Prisonmovement Weblog).  The article indicated that it was authored by inmate Woodard and provided the website . . . .  Upon obtaining this information Correctional Sergeant M. Bradley navigated to the website and reviewed its contents.  The article in my possession (attached) was the same article open for public or criminal review, located on the website.  In the article, Woodard made reference to two interviews I had conducted with him prior to this date. Woodard named me and the names of several other staff members at California State Prison-Solano (SOL).  Woodard falsely accuses me of calling someone (Mike Rhodes), who I do not know, an idiot.  Woodard makes other accusations toward staff that are believed to not be true.  Nevertheless, after reading this article in its entirety, I believe as  as long as this inmate has the capability to have this type of article published over the internet, it presents serious threats to my safety as well as the safety of other staff members who's [sic] names were mentioned in Woodard's article. It is my belief that this inmate has created an environment that could prevent me from being able to effectively perform my duties.

1     Based on the nature of this article, any interactions with this inmate
      can be deemed as retaliation for his publications.  It is my opinion,
2     by Woodard publishing my name over the internet in this matter; it
      has the potential to solicit threats and or harm towards me and my
3     family, as this internet blog invites bias comments from former
      inmates and their families.  I believe any further dealing with
4     Woodard would result in negative publications to this website,
      thereby, causing a condition likely to jeopardize my safety and the
5     safety of my family I believe.

6   Id.

7     Defendant Ferguson brought the article to defendant Bradley's attention.  Id.  On

8   July 14, 2009, defendant Bradley prepared a General Chrono which reads as follows:

9     On Thursday, July 9, 2009, at approximately 0700 hours, Lt. C.
      Ferguson brought to my attention an article authored by Inmate
10    Woodard, B-88207, 23-F-1L.  The article referenced Woodard's
      outlook on his day to day episodes of prison life.  In the article,
11    Inmate Woodard makes false accusations towards me implying
      preempted interviews and disciplinary tactics.  I referenced the still
12    available and published web article by Woodard.  The content
      appears to be the same that was shown to me by Lt. Ferguson.
13    This Web article is a Blog utilized to invite others comments.
      Inmate Woodard is using this blog to manipulate the Public and
14    Staff by referencing Staff names (without my prior approval for
      publication).  In this article I feel Woodard is attempting to slander
15    my name and the badge I swore upon.

16    I believe that Woodard's avenues of the Inmate Appeal system, (all
      levels) were not to his satisfaction and lashed out towards me in
17    particular.  I believe that Inmate Woodard's writings published on
      the Internet, jeopardizes my safety and possible [sic] my families
18    [sic] safety for the reason it is a PRISONMOVEMENT BLOG.
      This blog he chooses to post on have [sic] links to other Prison
19    resistance Web sites, i.e. http://criticalresistance10.blogspot.com/.
      I understand that Inmate Woodard has first amendment rights, but
20    the format he chooses to author his articles on misleads his
      audience to believe that I am the sole source of Inmate Disciplinary
21    or the Inmate Appeal System.  The comments on this blog come
      from bias [sic] inmate families and former inmates.  With my name
22    published by him negatively, these individuals can utilize people
      searches to access my personal information and jeopardize my
23    family's safety as well.  This publication is another form of
      manipulation showing Woodard cannot adjust or reason with the
24    authority appointed to maintain the safety and security of the
      Institution.  Inmate Woodard's continued presence at Solano would
25    allow him the ability to interact with me possibly gaining grounds
      for more false allegations and possibly retaliation toward myself or
26    my family.

4

1
> I am requesting that he be transferred to another appropriate Level
2
> II Institution where he can continue to program.

3 Id.

4       Together, defendants Ferguson and Bradley brought the article to the attention of

5 defendant Arthur.  Pl.'s Ex. G, Arthur Dep. 14:23–15:5.  Defendant Ferguson also brought the

6 article to the attention of defendant Brown.  Defs.' Ex. E, Brown Dep. at 40:19-25.  On July 9,

7 2009, defendant Blackwell signed an Administrative Segregation Unit Placement Notice ("Ad

8 Seg Notice") providing that plaintiff would be placed in administrative segregation.  Haviland

9 Decl., Attach. 2.  The notice reads:

10
> On July 9, 2009, you, Inmate Woodard, B-88207, are being
11
> removed from Facility IV General Population pending
> investigation into you publishing information on the internet that
12
> identifies CSP-Solano staff members by name.  Therefore, you are
> being removed from Facility IV General Population (GP) and
13
> placed in Administrative Segregation (Ad-Seg).  Based on this
> information, you are deemed a threat to the Level II General
14
> Population and the safety and security of this institution.  You will
> remain in Ad/Seg pending Administrative Review for your
15
> appropriate program and housing needs.  Per CCR 3272, your
> Custody level is being increased to Maximum to facilitate this
16
> move.

17 Id.  Under Part A of the Ad-Seg Notice, which sets forth four possible reasons for an inmate's

18 placement in Ad-Seg, there are check marks next to "presents an immediate threat to the safety of

19 self or others" and "endangers institution security."  Id.  It is "most likely" that defendant Arthur

20 directed defendant Blackwell to place plaintiff in administrative segregation.  Pl.'s Ex. G, Arthur

21 Dep. 34:25–35:8.  Defendants Rivas and Brown signed the Ad Seg Notice on July 10, 2009.  Id.

22 Haviland Decl., Attach. 2.

23       On July 10, 2009, defendant Rivas met with plaintiff to discuss plaintiff's

24 placement in Ad-Seg.  See Ex. F to Declaration of Michael G. Lee (Decl. of Lee),Rivas Dep.

25 49:19–50:18.  Following this meeting, Rivas approved plaintiff's continued detention in

26 administrative segregation pending a hearing before the Institution Classification Committee

("ICC").  Id.; see also Attach. 2 to Haviland Decl.  On July 16, 2009, plaintiff appeared before

the ICC for a review of his housing placement.  Haviland Decl. ¶ 5 and Attach. 3.   Also present

at the ICC Hearing were defendants Haviland and Brown, among others.  Id., Attach. 3.  At the

hearing, defendant Haviland told plaintiff that plaintiff was going to be placed for transfer.  Pl.'s

Ex. D, Haviland Sept. 10, 2009 Test. at 111:22-24.  The form CDC 128-G written following the

ICC hearing states that recommendation for transfer was "[b]ased on the nature of the article

written and the fact that it appears to specifically target a staff member at Solano for slander or

written retaliation."  Attach. 3 to Haviland Decl.  Defendant Haviland subsequently testified that

the decision to transfer plaintiff was "based on staff's safety concerns, not because he had

violated any rule or regulation."  Pl.'s Ex. D, Haviland Sept. 10, 2009 Test. 120:3-5.

At the ICC hearing, plaintiff stated that he did not want to transfer but if he had to

be transferred he requested transfer to San Quentin State Prison (San Quentin).  Attach. 3 to

Haviland Decl.  However, San Quentin was "closed for intake due to medical (possible swine

flu)" so the ICC did not recommend transfer to San Quentin.  Id.

The only measure considered by defendants in response to their concerns about

the article was transferring plaintiff to another institution.  Id. at. 151:17-25.  Defendants did not

consider transferring plaintiff to another yard at CSP-Solano because all of the yards at CSP-

Solano "commingle."  See Haviland Sept. 10, 2009 Test. 125:13-17.  They did, however,

eventually provide help to the identified staff to take their information off the internet so that they

could feel safer.  Id.

Plaintiff's transfer was deemed "non-adverse."  Haviland Decl. ¶¶ 5, 8 and Attach.

3.  A non-adverse transfer meant that plaintiff did not forfeit any "good time" credits as a result

of his temporary placement in Ad-Seg.  Id.

On July 23, 2009, defendant Brooks approved the ICC's recommendation to

transfer plaintiff and further approved plaintiff's continued placement in Ad-Seg pending his

transfer.  Attach. 4 to Haviland Decl.  On August 6, 2009, plaintiff was transferred from CSP-

1   Solano to CCC-Susanville.  Woodard Supp. Decl. ¶ 1.  During the transfer, plaintiff was hand-

2   cuffed, his hand cuffs were chained to a belly chain, and his legs were in irons for 14 hours while

3   he sat on a bus that stopped at several prisons before arriving at CCC-Susanville.  Woodard Decl.

4   in Opp'n to Defs.' MSJ ¶ 32.

5           On plaintiff's arrival at CCC-Susanville, plaintiff's typewriter was confiscated

6   because it had memory capabilities, which was not permissible per the CCC Department

7   Operations Manual Supplement.  Keeton Decl. ¶ 2; Woodard Decl. in Opp'n to Defs. MSJ ¶ 32.

8   Plaintiff, who has been diagnosed with carpal tunnel syndrome and had operations on both hands

9   for this condition, declares that handwriting exacerbates his pain and makes it very painful to

10  write letters, grievances, appeals, articles, and to correspond with others, including his attorney.

11  Woodard Decl. in Opp'n to Defs.' MSJ ¶37.  In addition, plaintiff did not receive any of his

12  personal property until seven days after his arrival, a 250-300 page manuscript that plaintiff had

13  been preparing for four years was lost, his mail was delayed, he lost telephone access during the

14  move, he was required to get a new prison job assignment, and his ongoing relationship with his

15  doctors for treatment of medical conditions was disrupted.  Id. ¶¶ 33-36.

16          On February 5, 2010, Sgt. Fleshman, a mailroom sergeant at CCC-Susanville,

17  rejected a publication by the name of SJRA Advocate, a newsletter for prisoners and their

18  families published by Sentencing and Justice Reform Advocacy ("SJRA") and which was

19  addressed to plaintiff.  Fleshman Decl. ¶¶ 1, 4.  Sgt. Fleshman reviewed the publication and felt

20  that it contained information that could be disruptive to the safety and security of the institution.

21  Id.  Specifically, he found the information contained on pages 2 and 11 violated California Code

22  of Regulations, title 15, sections 3006(c)(5) – plans to disrupt the order, or breach the security, of

23  any facility; 3006© – plans for activities which violate the law, these regulations, or local

24  procedures; and 3013 – unlawful influence.  Id.

25  /////

26  /////

1    On May 14, 2010, Sgt. Fleshman became aware that plaintiff wrote articles when

2    he came across one of plaintiff's writings in a copy of the SJRA Advocate.  Fleshman Decl. ¶ 7.

3    It is unclear whether Fleshman also rejected this issue of the SJRA Advocate.[3]  See id.

4    On July 3, 2012, plaintiff was transferred to the California Men's Colony

5    ("CMC") at San Luis Obispo, California.  Keeton Decl. ¶ 3; Woodard Decl. ¶ 5.

6    SUMMARY JUDGMENT STANDARDS UNDER RULE 56

7    Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant

8    summary judgment if the movant shows that there is no genuine dispute as to any material fact

9    and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[4]  A shifting

10   burden of proof governs motions for summary judgment under Rule 56.  Nursing Home Pension

11   Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir.

12   2010).  Under summary judgment practice, the moving party

13   always bears the initial responsibility of informing the district court of the basis
     for its motion, and identifying those portions of "the pleadings, depositions,
14   answers to interrogatories, and admissions on file, together with the affidavits, if
     any," which it believes demonstrate the absence of a genuine issue of material
15   fact.

16   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56©).

17   "Where the non-moving party bears the burden of proof at trial, the moving party need only

18   prove that there is an absence of evidence to support the non-moving party's case." In re Oracle

19   Corp. Sec. Litig., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ.

20   P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does

21   /////

22

23       [3]  In the complaint, plaintiff refers to two instances when his incoming mail was rejected,
     yet provides no details beyond his assertion that the incidents occurred in February and March
24   2010.  See Compl. ¶¶ 58, 82.

25       [4]  Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10,
     2010.  However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule
26   56, "[t]he standard for granting summary judgment remains unchanged."

1    not have the trial burden of production may rely on a showing that a party who does have the trial

2    burden cannot produce admissible evidence to carry its burden as to the fact").

3            If the moving party meets its initial responsibility, the opposing party must

4    establish that a genuine dispute as to any material fact actually does exist.  See Matsushita Elec.

5    Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986).  To overcome summary

6    judgment, the opposing party must demonstrate the existence of a factual dispute that is both

7    material, i.e., it affects the outcome of the claim under the governing law, see Anderson v.

8    Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Fortune Dynamic, Inc. v. Victoria's Secret Stores

9    Brand Mgmt., Inc., 618 F.3d 1025, 1031 (9th Cir. 2010), and genuine, i.e., "'the evidence is such

10   that a reasonable jury could return a verdict for the nonmoving party,'" FreecycleSunnyvale v.

11   Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010) (quoting Anderson, 477 U.S. at 248).  A

12   party opposing summary judgment must support the assertion that a genuine dispute of material

13   fact exists by:  "(A) citing to particular parts of materials in the record, including depositions,

14   documents, electronically stored information, affidavits or declarations, stipulations . . . ,

15   admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do

16   not establish the absence or presence of a genuine dispute, or that an adverse party cannot

17   produce admissible evidence to support the fact."[5]  Fed. R. Civ. P. 56(c)(1)(A)-(B).  However,

18   the opposing party "must show more than the mere existence of a scintilla of evidence."  In re

19   Oracle Corp. Sec. Litig., 627 F.3d at 387 (citing Anderson, 477 U.S. at 252).

20           In resolving a summary judgment motion, the evidence of the opposing party is to

21   be believed.  See Anderson, 477 U.S. at 255.  Moreover, all reasonable inferences that may be

22   drawn from the facts placed before the court must be viewed in a light most favorable to the

23   opposing party.  See Matsushita, 475 U.S. at 587; In re Oracle Corp. Sec. Litig., 627 F.3d at 387.

24
25           [5]  "The court need consider only the cited materials, but may consider other materials in
     the record."  Fed. R. Civ. P. 56(c)(3).  Moreover, "[a] party may object that the material cited to
     support or dispute a fact cannot be presented in a form that would be admissible in evidence."
26   Fed. R. Civ. P. 56(c)(2).

1    However, to demonstrate a genuine factual dispute, the opposing party "must do more than

2    simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record

3    taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

4    'genuine issue for trial.'"  <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

5                                                      DISCUSSION

6    A.    <u>Plaintiff's Retaliation Claim: CSP-Solano Defendants</u>

7           In his moving papers, plaintiff seeks partial summary judgment on his claim that

8    defendants retaliated against him for the online publication of the article.  Defendants claim they

9    are entitled to summary judgment because they did not retaliate against plaintiff.  Alternatively,

10   they argue that they are entitled to qualified immunity.

11          1.    <u>Applicable Standards</u>

12          The First Amendment guarantees that "Congress shall make no law ... abridging

13   the freedom of speech . . ."  U.S. Const. Amend. 1.  Moreover, it is well-settled that "convicted

14   prisoners do not forfeit all constitutional protections by reason of their conviction and

15   confinement in prison."  <u>Bell v. Wolfish</u>, 441 U.S. 520, 545 (1979).  However, "[l]awful

16   incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a

17   retraction justified by the considerations underlying our penal system."  <u>Id.</u> at 545-46 (internal

18   citations omitted).  Accordingly, a prisoner's First Amendment rights are "necessarily limited by

19   the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or

20   to maintain prison security."  <u>McElyea v. Babbitt</u>, 833 F.2d 196, 197 (9th Cir. 1987).

21          In the prison context, a First Amendment retaliation claim has "five basic

22   elements: (1) An assertion that a state actor took some adverse action against an inmate (2)

23   because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's

24   exercise of his First Amendment rights, and (5) the action did not reasonably advance a

25   legitimate correctional goal."  <u>Rhodes v. Robinson</u>, 408 F.3d 559, 567-68 (9th Cir. 2005).

26   /////

1    Prison inmates have a First Amendment right to send and receive mail.  Witherow

2  v. Paff, 52 F.3d 264, 265 (9th Cir. 1995).

3         The standards for evaluation of a First Amendment claim
          concerning outgoing correspondence sent by a prisoner to an
4         external recipient were established by the Supreme Court in
          Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d
5         224 (1974), overruled on other grounds by Thornburgh v. Abbott,
          490 U.S. 401, 413-14, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).
6         Under these standards, censorship of prisoner mail is justified only
          if "the regulation or practice in question [ ] further[s] an important
7         or substantial governmental interest unrelated to the suppression of
          expression" and "the limitation of First Amendment freedoms [is]
8         no greater than is necessary or essential to the protection of the
          particular governmental interest involved." Id. at 413, 109 S.Ct.
9         1874.  Procunier is controlling law in the Ninth Circuit and
          elsewhere as applied to claims involving outgoing prisoner mail.
10        Bradley v. Hall, 64 F.3d 1276, 1281 n. 2 (9th Cir.1995); Loggins v.
          Delo, 999 F.2d 364, 366 (8th Cir.1993); Brooks v. Andolina, 826
11        F.2d 1266, 1268-69 (3d Cir.1987); McNamara v. Moody, 606 F.2d
          621, 624 (5th Cir.1979).

12

13  Barrett v. Belleque, 533 F.3d 1060, 1062 (9th Cir. 2008).  Procunier v. Martinez established that

14  prison officials "may not censor inmate correspondence simply to eliminate unflattering or

15  unwelcome opinion or factually inaccurate statements."  Procunier v. Martinez, 416 U.S. at 413.

16  Rather, censorship of outgoing mail must further "one or more of the substantial governmental

17  interests of security, order, and rehabilitation."  Id.  Examples of "justifiable censorship of prison

18  mail" including "refusal to send or deliver letters concerning escaped [sic] plans or containing

19  other information concerning proposed criminal activity, whether within or without the prison.

20  Similarly, prison officials may properly refuse to transmit encoded messages."  Id.[6]  In addition,

21  ─────────────────────

22        [6]  In Harrison v. Inst. Gang of Investigations, 2010 WL 653137, at *6 n.3 (N.D. Cal.
    2010), the Northern District of California reviewed "published circuit cases both upholding and
    rejecting censorship of outgoing mail" and found that
23              the courts closely examine the fit between asserted penological
                interest and the particular outgoing mail being censored, rather
24              than accept at face-value an assertion by prison officials that the
                confiscation serves security or rehabilitation interests.  Cases
25              upholding censorship of outgoing mail include Morgan v.
                Quarterman, 570 F.3d 663, 667 (5th Cir. 2009) (penological
26              interest in rehabilitation justified disciplining inmate for sending

1  "the limitation of First Amendment freedoms must be no greater than is necessary or essential to

2  the protection of the particular governmental interest involved."  Id. at 413-14.

3        2.   Analysis

4        With respect to plaintiff's first claim, there is no dispute that defendants were

5  state actors, or that the actions taken against plaintiff were triggered by his acts of writing the

6  article and mailing it for publication.  The motions at bar raise essentially four questions on this

7  claim:  First, whether plaintiff's writing activity, particularly writing for publication the article

8  critical of prison staff and naming staff in the article, was protected by the First Amendment.

9  Second, whether plaintiff's writing activity was a "'substantial' or 'motivating' factor behind the

10  defendant's conduct."  Brodheim v. Cry, 584 F.3d 1262, 1271 (9th Cir. 2009) (quoting Sorrano's

11  Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989)).  Third, whether the actions taken

12  by defendants to place plaintiff in Ad-Seg, to retain him in Ad-Seg, and/or to transfer him to

---

14        vulgar note to opposing counsel, so it was not an impermissible infringement of his First Amendment rights); Koutnik v. Brown,

15  456 F.3d 777, 785-86 (7th Cir. 2006) (no First Amendment violation; confiscation of prisoner's mail to merchandising

16  company urging it to add communist-themed posters to its product line and enclosing drawing of swastika with cell bars that had

17  anti-corrections department slogan on ground that it had a gang symbol (i.e., the swastika) furthered important interest in

18  rehabilitation); Nasir v. Morgan, 350 F.3d 366, 375-76 (3d Cir. 2003) (ban on outgoing mail to former prisoners did not violate

19  prisoner's First Amendment rights); and Leonard v. Nix, 55 F.3d 370, 374-76 (8th Cir. 1995) (no First Amendment violation in

20  disciplinary action taken against prisoner for writing scurrilous comments about warden in letter to former inmate but intended to

21  be read by prison staff).  Cases finding constitutional violation in censorship of outgoing mail include Loggins v. Delo, 999 F.2d

22  364, 367 (8th Cir. 1993) (discipline imposed for outgoing mail that had offensive comments about mailroom clerk violated prisoner's

23  First Amendment rights because the offensive language did not implicate prison security concerns); and McNamara v. Moody, 606

24  F.2d 621, 624 (5th Cir. 1979) (refusal to mail prisoner's letter in which he wrote to his girlfriend that prison officer had sex with a

25  cat; court recognized that the statements were coarse and offensive but rejected prison guard's argument that allowing such mail would lead to a "total breakdown" in prison security.

26  Harrison, at *6 n.3.

1   CCC-Susanville were "adverse." And fourth, whether defendants' actions advanced "'legitimate

2   goals of the correctional institution.'"  Watison v. Carter, 668 F.3d 1108, 1115 (9th Cir. 2012)

3   (quoting Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir. 1985).  Subsidiary questions concerning

4   the personal involvement of some of the defendants are also tendered.

5            Defendants assert that plaintiff's writings "did not represent protected activity."

6   Memorandum of Points and Authorities Supporting Cross-Motion for Summary Judgment, filed

7   July 26, 2012, at 4.  Citing Schenck v. United States, 249 U.S. 47, 52 (1919), defendants contend

8   that plaintiff's writings are analogous to yelling fire in a crowded theater, conduct unprotected by

9   the First Amendment due to the high risk of injury engendered.  This contention is without merit.

10           The record is devoid of any evidence that the article was "used in such

11   circumstances and [was] of such a nature as to create a clear and present danger" of physical

12   harm.  Schenck at 52.  It is undisputed that the there is no regulation that prohibits an inmate

13   from putting the name of a member of correctional staff in an article on the internet.  See Pl.'s Ex.

14   I, Blackwell Dep. at 67:12-16; Brown Dep. 91:23–92:13.  Cf. Thaddeus–X v. Blatter, 175 F.3d

15   378, 395 (6th Cir. 1999) (stating that "if a prisoner violates a legitimate prison regulation, he is

16   not engaged in 'protected conduct,' and cannot proceed beyond step one").  Moreover, prisoners

17   "retain the right to send letters to the press concerning prison matters",  Nolan v. Fitzpatrick, 451

18   F.2d 545, 547-48 (1st Cir. 1971).  See also Procunier v. Martinez, 416 U.S. at 413 (striking down

19   prison regulation that called for the censorship of statements, inter alia, that 'unduly complain' or

20   'magnify grievances'); Pell v. Procunier, 417 US at 824 (affirming the right of prisoners to

21   correspond in writing with persons outside the prison, including representatives of the news

22   media); Simmat v. Manson, 535 F. Supp. 1115 (D. Conn. 1982) (prisoner, who wrote newspaper

23   column, had a "first amendment right to freedom of expression [which] encompasses the right to

24   express himself without punitive retaliation."); Sorens v. Estate of Mohr, 2005 WL 1965957

25   (S.D. Tex. 2005) ("Plaintiff's complaint alleges that defendants charged him with a prison

26   disciplinary action in retaliation for publishing articles critical of TDCJ alleges the violation of a

1  well established constitutional right to be free from governmental interference in his contacts

2  with the media if that interference is based on the content of his writings"); Shaheen v. Filion,

3  2006 WL 2792739, at *3 (N.D.N.Y. 2006) ("Shaheen's writing of articles critical of prison

4  officials and his complaints to prison officials in his capacity as the chairman of the ILC were

5  clearly assertions of his constitutional rights protected by the First Amendment"); Harr v. State of

6  Wisconsin Dept of Corr., 2001 WL 34372893 (W.D. Wis. 2001) (plaintiff stated a First

7  Amendment retaliation claim by asserting that defendants retaliated against him for writing a

8  letter to the media in which he was critical of the department).  See also Hustler Magazine v.

9  Falwell, 485 U.S. 46, 51 ("The sort of robust political debate encouraged by the First

10  Amendment is bound to produce speech that is critical of those who hold public office...."); New

11  York Times Co. v. Sullivan, 376 U.S. 254, 269 (1964) (recognizing "a profound national

12  commitment to the principle that debate on public issues ... may well include vehement, caustic,

13  and sometimes unpleasantly sharp attacks on government and public officials").

14          Based on the foregoing, this court finds that plaintiff's acts of writing and mailing

15  the article for publication were protected by the First Amendment.  Defendants' contention that

16  plaintiff's conduct was not protected because it was speech that physically endangered others,

17  including plaintiff, other inmates, and the identified prison staff and their families conflates the

18  question of whether the activity is protected with whether they could lawfully restrict that

19  activity.  That question is addressed infra.

20          The other three questions presented by the motions at bar are interrelated, and

21  resolution of all three turns on whether the acts of placing plaintiff in Ad-Seg and transferring

22  him advanced a legitimate correctional goal.  If the acts did advance a legitimate correctional

23  goal, plaintiff has no constitutional protection either against placement in Ad-Seg or in transfer to

24  a different prison facility.  See Sandin v. Conner, 515 U.S. 472, 484 (1995) (placement in

25  administrative segregation does not necessary give rise to protected liberty interest); see also

26  Meachum v. Fano, 427 U.S. 215, 225-27 (1976) (prisoners have no protected liberty interest in

being housed at a particular prison).  On the other hand, for purposes of a retaliation claim, an

adverse action is defined as one that would chill or silence a person of ordinary firmness from

future First Amendment activities or cause the prisoner to suffer more than minimal harm.  See,

e.g., Rhodes, 408 F.3d at 567–68, n.11.  On this record, the question of whether the action taken

against plaintiff was "adverse" turns on defendant's motivations for their actions and whether

those actions served a legitimate correctional goal.  For the reasons set forth below, disputed

issues of fact preclude summary judgment for either party on those questions.

Defendants contend that they placed plaintiff in Ad-Seg and transferred him

because the article posed a threat to the "safety and security" of the institution.  In support of

their motion, they present evidence that defendants Ferguson and Bradley were both concerned

for their safety and the safety of their families after they read the article.  See Ferguson Decl. at ¶

9; Bradley Decl. at ¶¶ 10-11.  Both defendant Ferguson and defendant Bradley averred that

contents of the article written about them by plaintiff were false.  See Ferguson Decl. at ¶ 7;

Bradley Decl. at ¶ 11.  In addition, defendant Ferguson averred that "[a]fter reading the article, it

was apparent to [Ferguson] that it would be difficult for me and other staff to effectively carry

out our duties without being accused of retaliation with each possible contact with Woodard.

Woodard's pattern was to label even routine activities of peace officers as retaliation against him

for his writings."  Ferguson Decl. at ¶ 9.  As set forth above, these concerns were communicated

to defendants Brown, Arthur, and Haviland.  Whether those concerns motivated the actions of

defendants Ferguson, Bradley, Brown, Arthur, and/or Haviland, and whether the actions they

took served a legitimate correctional goal, are disputed by plaintiff and not susceptible to

resolution at summary judgment.

Defendant Brooks seeks summary judgment on the ground that her sole role in the

events complained of was to review the ICC's transfer recommendation to make sure that it was

proper under application regulations, policies, and procedures.  There is no evidence that

defendant Brooks' acts of endorsing plaintiff for transfer to CCC-Susanville, and retaining him in

Ad-Seg pending that transfer were motivated by plaintiff's protected First Amendment conduct. Defendant Brooks is entitled to summary judgment.

Defendant Blackwell seeks summary judgment on the ground that his sole act was to write the order placing plaintiff in administrative segregation, which he was ordered to do by his superior.  The undisputed evidence shows that complying with that order, rather than plaintiff's protected First Amendment conduct, was the motivating factor for defendant Blackwell's action.  He is entitled to summary judgment.

Defendant Rivas seeks summary judgment on the ground that his sole involvement in the events complained of was serving plaintiff with the Ad-Seg notice and referring him to the ICC.  The undisputed evidence shows that performing that necessary function, rather than plaintiff's protected conduct, was the motivating factor for defendant Rivas' conduct.  He is entitled to summary judgment.

B.    Plaintiff's First Amendment Claim: CCC-Susanville

Defendants also move for summary judgment on plaintiff's second claim for relief – namely, that defendants Warden Barnes and Sgt. Fleshman violated plaintiff's constitutional rights when plaintiff's typewriter was confiscated and when Sgt. Fleshman rejected the delivery of a publication mailed to plaintiff.

1.    Confiscation of Plaintiff's Typewriter

Upon his arrival at CCC-Susanville, plaintiff's typewriter was confiscated because it had memory capabilities, in violation of the prison's regulations.  Plaintiff alleges Warden Barnes, in his supervisory capacity, violated plaintiff's due process rights when staff members at CCC-Susanville confiscated the typewriter.  See Compl. ¶¶ 77, 79.

The Due Process Clause protects against the deprivation of liberty without due process of law.  Wilkinson v. Austin, 545 U.S. 209 (2005).  In order to state a cause of action for a deprivation of due process, a plaintiff must first identify a liberty interest for which the protection is sought.  The Due Process Clause does not confer a liberty interest in freedom from

1   state action taken within a prisoner's imposed sentence.  Sandin v. Conner, 515 U.S. 472, 480

2   (1995).  However, a state may "create liberty interests which are protected by the Due Process

3   Clause."  Sandin, 515 U.S. at 483-84.  A prisoner has a liberty interest protected by the Due

4   Process Clause only where the restraint "imposes atypical and significant hardship on the inmate

5   in relation to the ordinary incidents of prison life."  Keenan v. Hall, 83 F.3d 1083, 1088 (9th Cir.

6   1996) (quoting Sandin, 515 U.S. at 484).

7            Prison restrictions on personal property that an inmate may possess do not violate

8   the Due Process Clause.  See, e.g., Cosco v. Uphoff, 195 F.3d 1221, 1224 (10th Cir. 1999)

9   (dismissing due process challenge to new prison policy limiting amount of property a prisoner

10  could keep in his cell); Blackwell v. Pizzola, 2010 WL 4505813, *6 (E.D. Cal. Nov. 12, 2010)

11  (dismissing due process challenge to confiscation of prisoner's JWIN radio as not imposing

12  atypical or signification hardship in relation to the ordinary incidents of prison life); Vogelsang v.

13  Tilton, 2008 WL 4891213, *4, (E.D. Cal. Nov. 12, 2008) (dismissing due process claim because

14  restrictions on number of appliances inmate is allowed to possess did not impose atypical or

15  significant hardship in relation to the ordinary incidents of prison life); Martin v. Hurtado, 2008

16  WL 4145683, *13 (S.D. Cal. Sept. 3, 2008) (dismissing due process challenge because

17  "deprivation of [inmates'] television does not pose an 'atypical and significant hardship' when

18  compared to 'the ordinary incidents of prison life' ").

19           On the record here, there is no evidence upon which the court could conclude that

20  the confiscation of plaintiff's typewriter is an "atypical and significant hardship" when compared

21  to "the ordinary incidents of prison life."  Sandin, supra.  While the court acknowledges the

22  hardship that the confiscation caused plaintiff in light of his medical problems, plaintiff does not

23  allege that he is prohibited from possessing a typewriter without memory capabilities, that his

24  typewriter was confiscated by defendants at CCC-Susanville in retaliation for plaintiff's exercise

25  of his First Amendment rights (indeed, that they were even aware of the reason for plaintiff's

26  transfer), or that the confiscation was arbitrary or capricious.  Plaintiff did not oppose defendants'

1   motion for summary judgment as to this claim.  Therefore, summary judgment should be entered

2   for Warden Barnes on plaintiff's due process claim.

3           2.        Rejection of Plaintiff's Incoming Mail

4           In February 2010, Sgt. Fleshman rejected a copy of the SJRA Advocate pursuant

5   to California Code of Regulations, title 15, sections 3006(c)(5) – plans to disrupt the order, or

6   breach the security, of any facility; 3006(c)(6) – plans for activities which violate the law, these

7   regulations, or local procedures; and 3013 – unlawful influence.

8           In their moving papers, defendants seek summary judgment on the ground that

9   Sgt. Fleshman did not retaliate against plaintiff.  See Defs.' Mot. for Summ. J. at 13.  The

10  defendants' moving papers evidences that they have misconstrued plaintiff's claim.  Plaintiff

11  does not claim these defendants retaliated against him in violation of his First Amendment rights.

12  Instead, plaintiff claims that Sgt. Fleshman, in his individual capacity, and Warden Barnes, in his

13  supervisory capacity, violated plaintiff's right to receive incoming mail.  He further claims that

14  the regulations cited by Sgt. Fleshman are unconstitutionally vague and overbroad and vest

15  excessive discretion in prison officials.[7]  Because defendants' motion seeks summary judgment

16  on a claim not raised by plaintiff, their motion should be denied.

17  C.      Qualified Immunity

18          Defendants assert that they are entitled to qualified immunity because, even if

19  their conduct was found to be unconstitutional, it would not have been clear to a reasonable

20  prison officer that such conduct was unlawful.[8]

21   

22      [7]  The court's notes in passing that its ability to evaluate the merits of these claims is
    hampered by the fact that the rejected issue of the SJRA Advocate has not been entered into the

23  record.  Defendants do not even describe the portions of the SJRA Advocate that they found
    issue with, other than to state that the contested portions are on pages 2 and 11 of the publication.

24  See Fleshman Decl. ¶ 4.

25      [8]  Concerning defendants' assertion of entitlement to qualified immunity for the conduct
    of defendants at CCC-Susanville, the court declines to address this argument because it was

26  found that Warden Barnes is entitled to summary judgment on plaintiff's due process claim and
    because it was further found that Warden Barnes and Lt. Fleshman are not entitled to summary

1        The doctrine of qualified immunity protects government officials from liability for

2   civil damages insofar as their conduct does not violate clearly established statutory or

3   constitutional rights of which a reasonable person would have known.  Pearson v. Callahan, 555

4   U.S. 223 (2009).  Resolving government officials' qualified immunity claims involves a two-step

5   process: the court must decide 1) whether the plaintiff has alleged or shown a violation of a

6   constitutional right; and 2) whether the right at issue was clearly established at the time of

7   defendant's alleged misconduct.  Qualified immunity is applicable unless the official's conduct

8   violated a clearly established constitutional right.  Id. at 815-16.  It is within the court's discretion

9   to decide which of the two prongs of the qualified immunity analysis should be addressed first in

10  light of the circumstances of a particular case.  Id. at 818.  See also Bull v. City and County of

11  San Francisco, 595 F.3d 964, 971 (9th Cir. 2010) (en banc) ("It is within our sound discretion to

12  decide which of the two prongs of the qualified immunity analysis should be addressed first in

13  light of the circumstances in the particular case at hand.") (Internal citations and quotations

14  omitted).  Where the constitutional inquiry "involves a question which is highly idiosyncratic and

15  heavily dependent on the facts," the court may proceed directly to the second prong and decide

16  whether the right in question was clearly established.  Mueller v. Auker, 576 F.3d 979, 994 (9th

17  Cir. 2009).

18        Whether a right is clearly established "turns on the objective legal reasonableness

19  of the action, assessed in light of the legal rules that were clearly established at the time it was

20  taken." Pearson, 129 S. Ct. at 822 (internal quotation and citation omitted); Delia v. City of

21  Rialto, 621 F.3d 1069, 1078 (9th Cir. 2010).  Plaintiff has the burden of demonstrating that the

22  right allegedly violated was clearly established at the time of the incident, and the "contours of

23  the right must be sufficiently clear that a reasonable official would understand that what he is

24  doing violates that right." Pearson, 129 S. Ct. at 822 (internal quotations and citations omitted).

25  ───────────────────

26  judgment for the rejection of incoming mail in light of the fact that they misconstrued plaintiff's
    claim.

1    In this case, the court concludes that Martinez articulates a clearly established

2  First Amendment right entitling a prison inmate to communicate criticism of prison officials in

3  newspaper articles or to write unflattering or unwelcome opinions or factually inaccurate

4  statements.  In support of their position that they are entitled to qualified immunity, defendants

5  cite to case law that is inapplicable here.  These cases relate to the filing of inmate grievances,

6  which, as discussed supra, are not on point in cases dealing with First Amendment retaliation

7  claims for outgoing mail.  Defendants are therefore not entitled to qualified immunity.

8  C.    The California Department of Corrections and Rehabilitation

9    Finally, in their moving papers, defendants seek dismissal of the California

10  Department of Corrections and Rehabilitation ("CDCR") on grounds of Eleventh Amendment

11  immunity.  Plaintiff names the CDCR solely for injunctive relief so as to prevent future

12  retaliatory transfers of plaintiff.  Though plaintiff is correct that there is no Eleventh Amendment

13  immunity for suits seeking prospective injunctive relief, see Will v. Michigan Dept. of State

14  Police, 491 U.S. 58, 71 n.10 (1989) (quoting Kentucky v. Graham, 473 U.S. 159, 167 n.14

15  (1985), and citing Ex parte Young, 209 U.S. 123, 159-60 (1908)), plaintiff's claim for injunctive

16  relief is subject to dismissal because he has not sued the head of the CDCR in his official

17  capacity, which is required to qualify for this exception.  See Ex parte Young, 209 U.S at 153-61;

18  see also Planned Parenthood of Idaho, Inc. v. Wasden, 376 F.3d 908, 919 (9th Cir. 2004) (stating

19  that the appropriate state official is the official charged with direct enforcement of the contested

20  statute).  This court will recommend that plaintiff be granted leave to amend the complaint to

21  name CDCR Secretary Jeffrey Beard as a defendant.  See Fed. R. Civ. P. 15.

22    Based on the foregoing, IT IS HEREBY RECOMMENDED that:

23    1.  Plaintiff's motion for partial summary judgment be granted in that it be

24  deemed established that plaintiff's acts of writing the article and mailing it for publication are

25  protected by the First Amendment and denied in all other respects;

26

2.  Defendants' cross motion for summary judgment be partially granted:

        a.      Judgement be entered for defendants Brooks, Blackwell, and Rivas on plaintiff's first claim for relief;

        a.      Judgment be entered for defendant Warden Barnes on plaintiff's due process claim;

        b.      Defendants' cross motion for summary judgment be denied in all other respects;

3.  Plaintiff be granted leave to amend his complaint to name CDCR Secretary Jeffrey Beard as a defendant; and

4.  This matter be referred back to the undersigned for further pretrial proceedings.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to objections shall be filed and served within seven days thereafter.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 95 1 F.2d 1153 (9th Cir. 1991).

DATED: February 25, 2013.

UNITED STATES MAGISTRATE JUDGE

/014/12
wood1807.msj.final3